**TRENK, DiPASQUALE, WEBSTER,**
**DELLA FERA & SODONO, P.C.**
347 Mt. Pleasant Avenue, Suite 300
West Orange, New Jersey 07052
(973) 243-8600
Richard D. Trenk (RT 6874)
*Proposed Attorneys for Debtor and*
*Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| WINDSOR LAKE ESTATES, L.L.C., a/k/a ASHDOWN FOREST ESTATES, L.L.C., a/k/a FOX CHASE AT SPARTA, L.L.C., a/k/a THE ESTATES AT FOX HOLLOW LAKE, | Case No. 10-_____  Honorable |
| Debtor. | |

**VERIFIED APPLICATION IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING (I) THE INTERIM USE OF CASH COLLATERAL; (II) ASSUMPTION AND APPROVAL OF AGREEMENT BETWEEN RANDALL AND JOANNA BEACH FOR THE CONSTRUCTION OF A HOUSE AND SALE OF THE ESTATE'S INTEREST IN CERTAIN REAL PROPERTY AT LOT 13, BLOCK NUMBER 35.07, SPARTA, NEW JERSEY, FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE; (III) AUTHORIZING POSTPETITION FINANCING AND USE OF REVOLVING CREDIT LINE, PURSUANT TO SECTIONS 105 AND 364 OF THE BANKRUPTCY CODE, AND AUTHORIZING THE DEBTOR TO CONVEY THE ESTATE'S INTEREST IN CERTAIN REAL PROPERTY AT LOTS 38.08, 38.07 IN BLOCK NUMBER 35 AND LOT 12 IN BLOCK NUMBER 35.07, SPARTA, NEW JERSEY, FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE (IV) AUTHORIZING THE PAYMENT OF A POSTPETITION RETAINER; AND (V) GRANTING OTHER RELATE RELIEF**

TO:    THE HONORABLE _____
       UNITED STATES BANKRUPTCY JUDGE

Windsor Lake Estates, L.L.C.[1] (the "Debtor"), by and through its undersigned counsel,

Trenk, DiPasquale, Webster, Della Fera & Sodono, P.C. ("Trenk DiPasquale"), hereby submits

this motion (the "Motion") for entry of an order (i) authorizing the Debtor's interim and final use

of cash collateral pursuant to sections 105, 361, 363(c)(2)(B), and 363(e) of title 11 of the United

States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), and Rule 4001(b) of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); (ii) assumption and approval of the

agreement (the "Beach Agreement") between the Debtor and Randall and Joanna Beach (the

"Buyers") for the construction of a house and sale of the estate's interest in certain real property

at Lot 13, Block Number 35.07, Sparta, New Jersey (the "Beach Property"), pursuant to sections

105 and 363 of the Bankruptcy Code, and Bankruptcy Rule 6004; (iii) authorizing postpetition

financing and use of credit line, pursuant to sections 105 and 364 of the Bankruptcy Code, and

authorizing the Debtor to convey the estate's interest in certain real property at Lots 38.08, 38.07

in Block Number 35 and Lot 12 in Block Number 35.07, Sparta, New Jersey (the "Security

Lots"), free and clear of all liens, claims, interests, and encumbrances, pursuant to sections 105

and 363 of the Bankruptcy Code; (iv) authorizing the payment of a postpetition retainer to Trenk

DiPasquale; and (v) granting related relief.   In support of the Motion, the Debtor respectfully

represents as follows:

---

[1] a/k/a Ashdown Forest Estates, L.L.C., a/k/a Fox Chase at Sparta, L.L.C., and a/k/a The Estates at Fox Hollow Lake.

## PRELIMINARY STATEMENT

1.      By this Motion, the Debtor seeks to use cash which may comprise cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral"), mainly to fund day-to-day operations, to maintain and preserve the value of the Debtor's assets in all cases for the benefit of the estate and its creditors.

2.      The Debtor also seeks the approval of the sale of the Beach Property to the Buyers and the use of a preexisting credit line to fund certain construction on the Beach Property in accordance with the terms of the Beach Agreement, which assumption and successful competition is critical to the successful reorganization of the Debtor.

3.      Additionally, the Debtor requests the authority to enter into a postpetition financing agreement with its prepetition lender, which will allow the Debtor the enhanced ability to maintain its operations as it forms an effective plan of reorganization.  As part of this financing agreement, the Debtor also seeks authority to convey the Security Lots to its lender.

4.      Finally, the Debtor seeks authorization to pay its attorneys a postpetition retainer as their continued efforts are critical to a successful outcome in this case, while at the same time the Debtor also seeks to ensure counsel is reasonably compensated for their efforts.

## JURISDICTION

5.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      This is a "core" proceeding pursuant to 28 §§ 157(b)(2)(A) and (M).

## BACKGROUND

7.      On December 21, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey.

8.      The Debtor continues to operate its business and manage its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   No trustees, examiners, or creditors' committees have been appointed in this case.

**History of the Debtor**

9.      The Debtor is a limited liability company, organized under the laws of the State of New Jersey.  Pursuant to its operating agreement, Brian Delaney ("Delaney") is the sole member of the Debtor, with full authority to operate its business and conduct its affairs.

10.      For years, the Debtor, through its principal, Delaney, has provided high quality homebuilding and real estate services to residents of Sparta Township, New Jersey.

11.      The Debtor's most substantial asset is a fully approved residential subdivision project known as the "The Estates at Fox Hollow Lake," and situated on Windemere Way, Fox Ridge Road, Hyde Park Place and Staffordshire Court in Sparta Township, New Jersey (the "Project").   The Estates at Fox Hollow Lake originally comprised a total of forty-nine (49) residential building lots.  The Debtor has previously sold twenty-eight (28) of the forty-nine (49) lots.  Thus, there remain twenty (20) undeveloped building lots and one "spec" house or model home on the twenty-first lot, located at 19 Windemere Way, Sparta Township, New Jersey 07871 (the "Windemere Property" and together with the Project, the "Property").

12.      The Debtor does not have employees; rather, all of the Debtor's operations are handled by Delaney and those professionals the Debtor retains on an as needed basis.

**The Debtor's Prepetition Relationship with First Hope Bank**

13.     The Debtor currently has two outstanding loan facilities with First Hope Bank ("First Hope") and acts as a guarantor on another loan made to Delaney personally.

14.     On July 23, 2009, the Debtor entered into a loan agreement with First Hope in the principal amount of $1,650,000 (the "Land Loan"), as a replacement to a prior loan agreement with First Hope.  As noted below, the Land Loan is secured by a promissory note and mortgage on the eighteen (18) of the twenty-one (21) subdivided lots on the Property.  Annexed hereto are copies of the Mortgage Note, the Mortgage, Security Agreement, and the Continuing Guaranty as **Exhibits A, B, C,** and **D** respectively.

15.     The Debtor further secured the Land Loan to First Hope by providing First Hope with an assignment of plans, specifications, permits and approvals.  Annexed hereto is a copy of the Assignment of Plans as **Exhibit E.**

16.     On July 23, 2009, the Debtor also entered into a loan agreement for a line of credit with First Hope in the principal amount of $2,000,000 (the "Construction Loan"), for the construction of the model home on the Windemere Property and other homes under contract of sale located on the Property.  Annexed hereto is a copy of the Mortgage Note, the Mortgage, Security Agreement, the Building Loan Agreement, and the Continuing Guaranty as **Exhibits F, G, H, I,** and **J** respectively.

17.     The Construction Loan was further secured by providing First Hope with an assignment of plans, specifications, permits and approvals. Annexed hereto is a copy of the Assignment of Plans as **Exhibit K.**

18.     According to the loan documents, the Land Loan and the Construction Loan were cross-collateralized and the loans are currently secured by the same eighteen (18) subdivided

lots, which includes the Windemere Property. These subdivided lots are as follows: Tax Lots 24, 25, 27, 28, 29, 31, 32, 34, 36 in Block 35.06; Tax Lots 12, 13, 14 in Block 35.07; and Tax Lots 38.03, 38.04, 38.07, 38.08, 47.02, 47.03 in Block 35, as shown on the Township of Sparta Tax Map.[2]

19.    Prior the Construction Loan and the Land Loan, on or about April 7, 2008, Delaney, personally, entered into a promissory note with First Hope in the principal amount of $500,000 (the "2008 Loan"). The 2008 Loan was secured by a promissory note and mortgage on two (2) of the subdivided lots on the Property, specifically Tax Lot 33 in Block 35.06; and Tax Lot 33 in Block 35. Annexed hereto are copies of Promissory Note, Mortgage, Commercial Guaranty, and the Business Loan Agreement as **Exhibits L, M, N, and O** respectably.

20.    The outstanding balance of the Land Loan is approximately $1,600,000; the outstanding balance of the Construction Loan is approximately $1,460,000, and the outstanding balance of the 2008 Loan is approximately $470,000.

21.    The mortgage(s), security agreement(s), note(s), assignments, and other loan documents by and between the Debtor and First Hope shall hereinafter collectively be referred to as the "First Hope Loan Documents."

22.    The "First Hope Cash Collateral" is defined as the collateral related thereto that which takes the form of cash and cash equivalent as described more fully in the First Hope Loan Documents.

23.    On November 25, 2009, Appraisal Services of North Jersey issued an appraisal on twenty (20) of the subdivided lots and valued it at $7,900,000. Attached hereto as **Exhibit P** is a true and correct copy of the appraisal by Appraisal Services.

---

[2] As noted herein, First Hope did hold a mortgage on Tax Lot 20 in Block 35.06 but this was recently released by First Hope to Robert Giblin. Additionally, Tax Lot 23 in Block 35.06 was sold on or about September 22, 2009. Upon information and belief, First Hope also provided a release of the mortgage on Tax Lot 23 in Block 35.06.

24.     On November 23, 2009, Professional Appraisal Services, issued an appraisal for First Hope on just the Windemere Property with the spec house and valued it at $2,000,000. Attached hereto as **Exhibit Q** is a true and correct copy of the appraisal by Professional Appraisal Services.

25.     The Debtor has also entered into certain loan modifications with First Hope. *See* **Exhibit R**.

**The Debtor's Prepetition Relationship with Robert Giblin**

26.     On April 15, 2010, the Debtor, as part of its prepetition efforts to restructure its business, entered into a loan agreement with Robert Giblin (the "Giblin") in the principal amount of $200,000 (the "Giblin Loan"). The loan was secured by a mortgage on Tax Lot 20 in Block 35.06 (the "Giblin Lot"), which First Hope had held a security interest on. (The mortgage and other loan documents by and between the Debtor and Giblin shall hereinafter collectively be referred to as the "Giblin Loan Documents"). Annexed hereto is a copy of the Giblin Mortgage as **Exhibit S**.

27.     The "Giblin Cash Collateral" is defined as the collateral related thereto that takes the form of cash and cash equivalent as described more fully in the Giblin Loan Documents (the Giblin Cash Collateral and together with the First Hope Cash Collateral, the "Cash Collateral").

**Event's Leading to the Debtor's Bankruptcy Filing**

28.     The Debtor, like so many other property developers, has been severely affected by the weak economy, and more specifically, the dire state of the residential housing market, which has slowed the Debtor's ability to sell the subdivide lots on the Property.

29.    The Debtor, after straining for months to make payments, projects that it will not be able to make regular payments due on its promissory note obligations, to its largest lender, First Hope.

30.    The Debtor also suffered substantial losses due to defalcations by certain individuals previously appointed to help run the company.  Litigation is currently pending concerning these claims.

31.    In and around June, 2002, Delaney and Richard Crepeau ("Crepeau") entered into a business and management agreement, which provided, among other things, that Crepeau would run the day to day operations of the Debtor.

32.    The need to hire a reportedly seasoned veteran of the residential development business, in the form of Crepeau, was necessitated by Delaney devoting his time and efforts to other challenges.

33.    In and around 2002, as Delaney and Crepeau agreed to work together, Delaney became embroiled in litigation as a result of his employment with Knight Securities, L.P. ("Knight") for whom he worked as an equity trader, market maker and vice-president of trading at the time.  Due to the fact Knight and he were the subject to an investigation by the Securities and Exchange Commission, the United States Attorneys' Office for the District of New Jersey, and the New Jersey Bureau of Securities, involving Delaney and certain other Knight employees, Delaney was not able to devote the necessary time to oversee the Debtor's day to day operations, which was eventually transferred to Crepeau.

34.    Delaney began cooperating with the government in its investigation and made full restitution to Knight.  Delaney's cooperation was hailed by various agencies as being extremely helpful and important to the government's successfully investigation and prosecutions.  Indeed,

then U.S. Attorney, Christopher J. Christie, wrote a letter in support of a reduced sentence, which was part of a settlement with the government.    Eventually Delaney was sentenced to one year in jail.

35.    Unfortunately, after paying his debt to Knight and society, Delaney was released to find that Crepeau and his affiliates had acted improperly while running the Debtor.  Indeed, as of the Petition Date, the Debtor and Delaney has litigation pending against Crepeau and his affiliates in the action entitled *Ashdown Forest Estates, LLC v. Richard Crepeau, et al.*, filed in the Superior Court of New Jersey, Morris County, Docket No. MRS-C-112-07 (the "Crepeau Action").

**The Debtor's Marketing Efforts**

36.    The Debtor has been very active in both traditional and non-traditional marketing efforts to increase sales.  The Debtor's recent marketing efforts include, among other things, hosting a weekend art exhibition for local artists of some prominence on the Windemere Property, and agreeing to donate a percentage of the sale proceeds to local charity organizations including local parochial and religious schools.  The Debtor will also host a clothing trunk sales event.  All these efforts are aimed at gaining enhanced traffic of affluent individuals who may have a prospective interest in purchasing a home or lot in the Project.

**The Beach Agreement and Sale of the Beach Property**

37.    Despite the continued real estate recession, the Debtor's hard work and marketing are beginning to achieve results.

38.    Prior to the Petition Date, on September 28, 2010, the Debtor entered into the Beach Agreement with the Buyers.   The Beach Agreement provides for the sale of the Beach

Property to the Buyers and the construction of a house on the Beach Property by the Debtor. A

true and correct copy of the Beach Agreement is attached hereto as **Exhibit T**.

39.    The salient terms of the Beach Agreement can be summarized as follows:[3]

The Parties:  The Buyers under the Beach Agreement are Randall and Joanna
Beach.

The Beach Property:  The land, together with any buildings, structures, and
improvements thereon and the appurtenances thereto, situated at Block 35.07, Lot
13 on the tax map for Sparta and State of New Jersey.

The Purchase Price: The total consideration for the sale of the Beach Property,
with a newly constructed house is $756,600.

The Deposit(s) and Balance Due:  The sum of $2,500 was paid initially by the
Buyers, and a further additional deposit of $75,410 was paid five (5) days after
attorney review (such sum is hereinafter referred to as the "Deposit"), which is
being held by the Debtor's real estate attorney, Weiner Lesniak LLP[4]. A further
deposit in the amount of $75,410 is due upon completion of the roof of the house
to be built on the Beach Property.   The remaining balance due shall be paid at
closing.

House to be Built:  The Debtor will construct a custom house on the Beach
Property in accordance the terms of the Beach Agreement.

**Higher and Better Offers**

40.    The Debtor will accept all higher and better offers on the estate's interest in the

Beach Property up to and including the hearing date.  All bidders must have $10,000 in certified

funds on the hearing date in order to bid.

**Use of Line of Credit with First Hope to Complete the Beach Agreement**

41.    The Debtor seeks the immediate approval of the use of its line of credit in the

form of the Construction Loan in order to pay critical expenses associated with the construction

of the custom house for the Buyers.

---

[3] This summary is qualified in its entirety by the Beach Agreement and is intended solely to give the Bankruptcy
Court and interested parties a brief overview of the significant terms of the Beach Agreement.  Interested parties
should refer to the Beach Agreement for the complete and detailed terms thereof.
[4] The Debtor is in the process of retaining Weiner Lesniak LLP as special real estate counsel.

42.    First Hope has agreed to allow the Debtor access to the line of credit that is part of the Construction Loan.

43.    Prior to bringing this Motion, the Debtor made diligent, but unsuccessful, efforts to obtain unsecured credit from various brokers, traditional lenders, and individuals.

44.    Accordingly, the only readily available lender in this case to finance the Beach Agreement is First Hope.

45.    As part of allowing access to the Construction Loan and agreeing to certain other postpetition financing in the form of the New First Hope Loan (as defined below), First Hope provided certain additional requirements to the Debtor's use of the Construction Loan, including, but not limited to, limiting the borrowing amount to $450,000, establishing certain benchmarks for repayment and the conveyance of the Security Lots back to the Debtor. *See* **Exhibit U**.

46.    The Debtor seeks an unsecured ordinary administrative expense priority credit for the use of the Construction Loan pursuant to section 364(b) of the Bankruptcy Code.

**The New First Hope Loan and the Postpetition Retainer**

47.    The Debtor also seeks the immediate approval of a new postpetition financing agreement (the "New First Hope Loan") with First Hope.

48.    The following is a summary of the material terms of the New First Hope Loan, all of which is more fully set forth in the Term Sheet, annexed hereto as **Exhibit U**:

a.    *Interest Rate*:  Five and one half (5.5 %) percent per annum;

b.    *Maturity*:  The New First Hope Loan shall mature on October 31, 2011, or December 31, 2011, if approved by First Hope;

c.    *Security*:  Junior lien on the "New First Hope Loan Lots", which includes all the lots encompassing the Property *other than the Giblin Lot*, which is excluded and not part of any security interest conveyed to First Hope as part of the New First Hope Loan, and the personal guaranty of Delaney.  The Debtor will convey the Security Lots.

    d.     *Borrowing Limit*:  $249,000; and

    e.     *Borrowing Conditions*:  The New First Hope Loan will be used to pay: outstanding property taxes, interest to First Hope, insurance on the Property, maintenance and utilities bills; and other necessary and essential expenses of the Debtor.

49.    Included as part of the New First Hope Loan is a budgeted line item in the amount of $40,000 to be used by the Debtor for the payment of legal fees and expenses.  As set forth more fully below, the Debtor requests the approval of the payment of $40,000 to Trenk DiPasquale as a postpetition retainer (the "Postpetition Retainer").[5]

## THE VARIOUS RELIEF REQUESTED AND THE BASIS THEREIN

### A.    The Debtor Should Be Authorized to Use Cash Collateral

50.    The Debtor should be authorized to use the Cash Collateral in the ordinary course of its businesses and in accordance with the budget annexed hereto as **Exhibit V** (the "Budget"), because First Hope and Giblin are adequately protected by the fact that the value of the Property is not declining, and the Property is adequately insured.

51.    It is in the best interests of the Debtor and its estate that the Debtor's operations continue.  For that to occur, the Debtor must be authorized to use the Cash Collateral.  A hasty liquidation of the Debtor's assets is contrary to the best interests not only of the Debtor, but also to its creditors, both secured and unsecured.

### Legal Authority for the Use of Cash Collateral

52.    Pursuant to section 363(a) of the Bankruptcy Code, cash collateral is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents ..." and the proceeds thereof.  Pursuant to section 363(c)(2) of the Bankruptcy Code

---

[5] Concurrently herewith, the Debtor has filed an application for the retention of Trenk DiPasquale as its counsel for these proceedings.

and Bankruptcy Rule 4001(b), a debtor may not use cash collateral unless the entity that has an

interest in such cash collateral consents, or until the Court authorizes the use of cash collateral

after notice and a hearing, upon a finding that the interest of the secured party is adequately

protected.

53.     Section 363(c)(2) of the Bankruptcy Code permits courts to allow a debtor to use

cash collateral so long as the debtor provides its secured creditors with adequate protection.

"Adequate Protection" is not defined in the Bankruptcy Code, although section 361 of the

Bankruptcy Code sets forth three non-exclusive methods of how an interest in property may be

adequately protected.    Moreover, courts have traditionally had broad flexibility under section

361 of the Bankruptcy Code in deciding what constitutes adequate protection.

54.     Indeed, "adequate protection" is aptly described as "a balancing of the debtor's

and a creditor's respective harm." *In re Carson*, 34 B.R. 502, 505 (D. Kan. 1983) (citation

omitted).   The legislative history of section 361 of the Bankruptcy Code reflects Congressional

intent to give court flexibility to fashion adequate protection in light of the facts of each case and

general equitable principles. *In re 5-Leaf Cover Corp.*, 6 B.R. 463, 466 (Bankr. S.D.W.Va.

1980).

> This section specifies the means by which adequate protection may
> be provided. It does not require the court to provide it.  To do so
> would place the court in an administrative role.  Instead, the trustee
> or debtor in possession will provide or propose a protection
> method. If the party that is affected by the proposed action objects,
> the court will determine whether the protection provided is
> adequate. The purpose of this section is to illustrate means by
> which it may be provided and to define the contours of the
> concept.

H.R. Rep. No. 95-595, at 338, 95th Cong., 1st Sess. (1977); *Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.),* 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis.").

55.    The principal purpose of adequate protection is to safeguard the interest of the secured creditor in the particular collateral against diminution in the value of such interest. *See In re Swedeland Dev. Group. Inc.,* 16 F.3d at 564 ("[T]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (quoting *In re O'Connor,* 808 F.2d 1393, 1396 (10th Cir. 1987)); *see also In re DeSardi,* 340 B.R. 790, 804 (Bankr. S.D. Tex. 2006) ("The purpose of adequate protection is to assure that the lender's economic position is not worsened because of the bankruptcy case."); *In re Hollins,* 185 B.R. 523, 528 (Bankr. N.D. Tex. 1995*)* ("Adequate protection seeks to protect a creditor from an [sic] decline in the value of its collateral. . . . ").

56.    However, the Debtor is mindful that the "Court is not obligated to protect the creditor better than it did itself when making the loan and obtaining security." *In re Heatron, Inc.,* 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980). The "interest" in property that is to be protected by section 361 of the Bankruptcy Code is the value of the collateral, not contractual or legal rights such as receiving interest or being permitted to foreclose on default. *In re Marion Street Partnership,* 108 B.R. 218, 224 (Bankr. D. Minn. 1989) (citing *United Sav. Ass'n v. Timbers Assocs.,* 108 S.Ct. 626, 630 (1988)). The alleged secured creditor is only entitled to assurance that the value of its lien will not decrease as a result of the automatic stay and, if it does, that it will receive something as compensation for the decrease. *In re Ramco Well Service, Inc.,* 32 B.R. 525, 531 (Bankr. W.D. Okla. 1983).

57.    Thus, where the value of the collateral is not declining, a debtor need not do anything for the secured creditor as it is adequately protected. *In re Ramco Well Service, Inc.,* 32 B.R. 525, 531 (Bankr. W.D. Okla. 1983); *See also Westchase I Assocs., L.P. v. Lincoln National Life Ins. Co. (In re Westchase Assocs., L.P.),* 126 B.R. 692, 694 (W.D.N.C. 1991) (holding that "if the value of the property itself is not declining . . . the creditor would not be entitled to protection of the accruing interest value of the claim.").

58.    Moreover, courts have routinely held that adequate protection may be demonstrated by a showing that the going concern value of the debtors, or the value of the lender's collateral, is preserved by the debtor's continuing operations and use of cash collateral. *See In re Snowshoe Co. Inc.,* 789 F.2d 1085, 1087 (4th Cir. 1986) (allowing use of cash collateral to operate ski resorts where trustee reported that ski resort would lose 50% to 90% of its fair market value if it ceased operations); *In re 499 W. Warren St. Assocs. Ltd. P'ship,* 142 BR. 53, 56-57 (Bankr. N.D.N.Y. 1992)(finding secured creditor's interest in collateral adequately protected when cash collateral was applied to normal operating and maintenance expenditures on collateral property); *In re Constable Plaza Assocs., L.P.,* 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (debtor entitled to use cash collateral to operate and maintain office building, thereby protecting secured lender's collateral).

**Secured Creditors are Adequately Protected**

59.    In the case *sub judice*, the Debtor seeks the preliminary and final use of cash collateral to preserve its assets so as to maintain and maximize its value for the benefit of all parties-in-interest.  However, a denial of the use of Cash Collateral to fund Debtor's day-to-day operations will harm the Debtor at a critical time; which will cause a loss of going concern value,

and preclude the ability to reorganize, thereby preventing creditors from realizing upon reorganization value.

60.     As is demonstrated herein, under either or both theories of adequate protection, to wit, absence of diminution in value or equity cushion, First Hope and Giblin remain adequately protected notwithstanding the Debtor's use of the Cash Collateral.  Indeed, the value of the Property is not declining, and therefore, First Hope and Giblin are adequately protected.

61.     The use of the Cash Collateral in the manner and for the purposes proposed will maintain the overall value of the Debtor's ongoing enterprise and enhance the chances of a successful outcome for this case.  Indeed, the Debtor has a real ability to reorganize within a reasonable period of time and make significant distribution to all of creditors.  If, however, the Debtor is precluded from making expenditures necessary to maintain its assets and conduct ongoing sales operations in the ordinary course, or if the Debtor is forced to effect a "fire-sale" liquidation of their assets, First Hope and Giblin, indeed all creditors — secured and unsecured — will be harmed.  *See In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. ED. Pa. 1991) ("The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.") (citing *In re Grant Broad. of Philadelphia, Inc.*, 71 13.R. 376, 386-89 (Bankr. E.D. Pa. 1987).

62.     Additionally, the Debtor is prepared to discuss with its secured and unsecured creditors the development of both a financial and operational restructuring plan.  The authority to use Cash Collateral will enable the Debtor to engage in those discussions and accomplish its reorganization, while operating in the ordinary course.

63.    Here, adequate protection is shown by an absence in diminution of the value of collateral.    In this case, the Property is fully insured, and is not going to decline in value. Therefore, the interests of First Hope and Giblin are adequately protected.

**B.    The Sale of the Beach Property is in Good Faith and is a Proper Exercise of the Debtor's Business Judgment**

64.    Section 363(b)(l) of the Bankruptcy Code provides that a Debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. . . ." 11 U.S.C. § 363(b)(l); *see also* Fed. R. Bankr. P. 6004(f)(1) (authorizing sales outside of the ordinary course of business to be conducted privately or by public auction).    A debtor-in-possession is given these rights by section 1107(a) of the Bankruptcy Code.    Moreover, section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary and appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

65.    Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets. However, courts in the Third Circuit have found that a sale of a debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business judgment exists for such a sale. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (applying the "sound business purpose test" set forth in *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)).

66.    Courts typically consider the following four factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. *In re Weatherly Frozen Food Group, Inc.*, 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992); *Del. & Hudson Ry.,* 124 B.R. at 176; *In re Phoenix Steel Corp.,* 82 B.R. 334, 335-36 (Bankr. D. Del. 1987); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D.Pa.1991).

67.    In this case, all of those factors have been met.

**i.    Sound Business Justification for the Sale**

68.    Courts have made clear that a debtor's showing of a sound business justification does not have to be unduly exhaustive. Rather, a debtor is "simply required to justify the proposed disposition with sound business reason . . . ." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Moreover, the paramount goal in any proposed sale of property of the estate is to maximize the value received by the estate. *See In re Food Barn Stores, Inc.*, 107 F.3d at 564-65 (8th Cir. 1997)(stating that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992)("It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." (quoting *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

69.    There is more than adequate business justification to sell the estate's interest in the Beach Property. Based upon an analysis of the Debtor's professionals the sale of the Beach

18

Property to the Buyers, pursuant to the terms and conditions set forth in the Beach Agreement, is in the best interests of the estate. Here the sale of the Beach Property will provide much needed funds to help the Debtor in its reorganization efforts. Accordingly, as set forth herein, the proposed sale is supported by sound business judgment.

**ii.      The Debtor is Providing Adequate Notice of the Sale**

70.      In accordance with Bankruptcy Rule 6004, sales of property outside the ordinary course of business may be by private sale or public auction. Fed. R. Bankr. P. 6004(f)(1). Bankruptcy Rule 6004 further provides that "[n]otice of a proposed use, sale, or lease of property, other than cash collateral, not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(1), (i), and (k) and, if applicable, in accordance with [section] 363(b)(2) of the Code." Fed. R. Bankr. P. 6004(a). Pursuant to Bankruptcy Rule 2002(a)(2) this Court may, for cause shown, shorten or direct another method of giving notice regarding the general twenty-day-by-mail period for the proposed use, sale, or lease of the estate's property outside the ordinary course of business. Fed. R. Bankr. P. 2002(a)(2). Pursuant to Bankruptcy Rule 2002(c)(1), the notice of the proposed use, sale, or lease of property required under Bankruptcy Rule 2002(a)(2) must include the time and place of any public sale, the terms and conditions of any private sale, and the time fixed for filing objections. Fed. R. Bankr. P. 2002(c)(1). Moreover, the notice of a proposed use, sale, or lease of property is sufficient if it generally describes the property. *Id.*

71.      In this case, the notice provision has been met because all parties-in-interest in the Debtor's bankruptcy case are receiving notice of the sale.

iii.    **The Beach Property is Being Sold for Fair Value**

72.    Moreover, the Debtor is receiving the best possible price for the Beach Property,
because the sale price is the highest offer that the Debtor has received on the Beach Property,
which it has been marketing for some time.  The proposed sale of the estate's interest in the
Beach Property is subject to higher and better offers and any potential bidders are invited to
attend the hearing on this Motion.

iv.    **Good Faith Buyer Requirement**

73.    Finally, the parties here are acting in good faith, and therefore, the protections of
section 363(m) of the Bankruptcy Code should apply to the Buyers.

74.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith," the Third Circuit
has construed the "good faith buyer" standard to mean one who purchases "in good faith" and for
"value."  Courts have indicated that a party must show fraud or collusion between a purchaser
and the debtor or trustee in order to demonstrate a lack of good faith.  *Abbotts Dairies*, 788 F.2d
at 147.

75.    Here, there has been no collusion between the Buyers and the Debtor.  Further,
for months the Debtor made diligent efforts to market and sell the Beach Property.  None of
those efforts yielded a sale price that was greater than the Buyers' proposed sale price.

76.    Additionally, through and until the hearing on this Motion, the Debtor will
consider all higher and better offers for the estate's interest in the Beach Property.

77.    Indeed, in light of the open sale process, nothing here suggests any fraud or collusion. Accordingly, the Debtor respectfully requests that this Court make a finding that the Buyers is a "good faith purchaser" pursuant to section 363(m) of the Bankruptcy Code.

**C.    The Debtor should be Allowed to Sell the Estate's Interest in the Beach Property "Free and Clear" Pursuant to Subsection 363(f)**

78.    The Debtor should be able to sell the Beach Property free and clear of all liens, claims, interests, and encumbrances because the requirements of section 363(f) of the Bankruptcy Code have been satisfied. In accordance with section 363(f) of the Bankruptcy Code, a Debtor may sell property under section 363(b) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

(i)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(ii)    such entity consents;

(iii)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(iv)    such interest is in *bona fide* dispute; or

(v)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Because section 363(f) of the Bankruptcy Code is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of the proposed sale of the Property. *Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 257 (3d. Cir. 2000) (discussing how section 363(f) of the Bankruptcy Code authorizes the sale of a debtor's assets free and clear of all liens, claims and interests if "any one of [the] five prescribed conditions" is met); *In re Kelistrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002)

(stating that a court may approve a sale "free and clear" provided at least one of the subsections of section 363(f) is met); *see also DVI, Inc.,* 306 B.R. 496, 503 (Bankr. D. Del. 2004).

79.    Here, the sale price is greater than the aggregate amount of any liens on the property.  Moreover, the secured creditor, First Hope, has consented to the sale.  As such, the requirements of subsection 363(f) have been satisfied and the sale of the estate's interest in the Beach Property free and clear of all liens, claims and interests, with all valid liens claims and interests, if any to attach to the proceeds of the sale.

**Assumption of Beach Agreement**

80.    Assumption of the Beach Agreement, as it relates to the sale of the Beach Property and construction of a house on the property, is proper under section 365 of the Bankruptcy Code and critical to the Debtor's reorganization.  Section 365(a) of the Bankruptcy Code provides that a debtor-in-possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).

81.    A debtor's motion to assume or reject an unexpired lease or executory contract is subject to judicial review under the business judgment standard.  *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989); *In re Trans World Airlines, Inc.*, 261 B.R. 103, 120-21 (Bankr. D. Del. 2001); *In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987); *see also In re Nickels Midway Pier, LLC*, 341 B.R. 486, 493 (D.N.J. 2006) ("Although the Bankruptcy Code does not specify the standard to be applied in assessing the decision of a trustee or debtor in possession to assume or reject of [sic] a contract, the Third Circuit has adopted the business judgment standard.").  This standard is satisfied when a debtor determines that assumption or rejection will benefit the estate.  *See Sharon Steel*, 872 F.2d at 39-40; *Wheeling-Pittsburgh*, 72 B.R. at 846.

82.    A court should approve the assumption or rejection of an unexpired lease or executory contract where a debtor's business judgment has been reasonably exercised. *See In re III Enters., Inc. V*, 163 B.R. 453,469 (Bankr. E.D. Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject an executory contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment - a standard which we have concluded many times is not difficult to meet."), *aff'd sub nom., Pueblo Chem., Inc. v. III Enters. Inc., V*, 169 B.R. 551 (E.D. Pa. 1994); *Wheeling- Pittsburgh*, 72 B.R. at 849 ("Ordinarily, courts accord the debtor's business judgment a great amount of deference since the decision to assume or reject an executory contract is an administrative not a judicial matter.").

83.    Only where the debtor's actions are a product of bad faith, whim, caprice or a gross abuse of its managerial discretion should the business decision be disturbed. *See Trans World Airlines*, 261 B.R. at 121 ("A debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of bad faith, or whim or caprice." (internal citations and quotations omitted)); *III Enters.*, 163 B.R. at 469 ("We will not substitute our own business judgment for that of the Debtor, nor will we disturb its decision to reject the [contract] unless the decision is so unreasonable that it could not be based on sound business judgment, but only on bad faith or whim." (internal citations and quotations omitted)); *Wheeling-Pittsburgh*, 72 B.R. at 849 ("[T]he court should not interfere with or second guess the debtor's sound business judgment unless and until evidence is presented that establishes that the debtor's decision was one taken in bad faith or in gross abuse of its retained business discretion.").

84.    Bankruptcy Code section 365(b)(1) sets forth the following requirements that a debtor-in-possession must satisfy before it may assume an executory contract:

If there has been a default in an executory contract or unexpired lease of the debtor, the [debtor-in-possession] may not assume such contract or lease unless, at the time of assumption of such contract or lease, the [debtor-in-possession]—

    (A) cures, or provides adequate assurance that the [debtor-in-possession] will        promptly cure, such default . . . ;

    (B) compensates, or provides adequate assurance that the [debtor-in-possession] will promptly  compensate . . ., for any actual pecuniary loss to such party        resulting from such default; and

    (C) provides adequate assurance of future performance under such contract or        lease.

11 U.S.C.A. § 365(b)(1) *see also In re ANC Rental Corp., Inc.*, 277 B.R. 226, 238 (Bankr. D. Del. 2002) ("Having met the threshold requirement of a sound business purpose, the Debtors must also cure any existing defaults and provide adequate assurance of future performance of the assigned contracts.").

85.    "The phrase adequate assurance of future performance . . . . is to be given a practical, pragmatic construction based upon the facts and circumstances of each case. Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance." *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (internal citations and quotations omitted); *see also Cinicola v. Scharffenberger*, 248 F.3d 110, 120 n.10 (3d Cir. 2001) (quoting *Carlisle*).

86.    Here, the Debtor has determined that assumption of the Beach Agreement is in the best interests of the Debtor's estate because it is a valuable estate asset that will continue to provide value as the Debtor continues to refine its business plan and ultimately effect a successful reorganization of its business.    Indeed, the Debtor's assumption of the Beach Agreement in this case meets the business judgment test because assumption of the agreement will benefit the Debtor, the estate and creditors.

87.    With respect to the Debtor's cure obligations, as required by section 365(b)(1)(A) of the Bankruptcy Code, the Debtor is current under its obligations of the Beach Agreement as it progresses towards a confirmable chapter 11 plan. Therefore, the Debtor submits that the requirement of section 365(b)(1)(C) of the Bankruptcy Code that the Debtor provide adequate assurance of future performance is met as well.

88.    Accordingly, the Debtor submits that assumption of the Beach Agreement is an exercise of sound business judgment and is in the best interest of the Debtor, its estate and creditors.

**D.    Authorization of Postpetition Financing and the Conveyance of the Security Lots**

89.    The Debtor also seeks approval, on a final basis, of the New First Hope Loan and the use of the Construction Loan to fund the construction of a custom house as required by the terms of the Beach Agreement, pursuant to sections 105, 364(b), 364(c), and 503(b)(1) of the Bankruptcy Code. Additionally, in accordance with the terms of the New First Hope Loan, the Debtor also seeks authority to convey the Security Lots to First Hope, pursuant to sections 105 and 363 of the Bankruptcy Code.

90.    The Bankruptcy Code authorizes a debtor to obtain credit and incur debt "[t]he court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense." 11 U.S.C.A. § 364(b).

91.    As one court noted, "[t]he debtor-in-possession may incur postpetition unsecured debt outside the ordinary course of business, but it must seek the Bankruptcy Court's authority

pursuant to 11 U.S.C. § 364(b)." *In re Sherwood Square Associates*, 107 B.R. 872, 875 (Bankr.D.Md.1989).

92.     Additionally, the Bankruptcy Code authorizes a debtor to obtain credit and incur debt "with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title." 11 U.S.C. § 364(c)(1).

93.     The Bankruptcy Code also authorizes a debtor to obtain credit and incur debt "secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c)(3).

94.     In order to obtain a court's authorization for postpetition credit pursuant to section 364(c) of the Bankruptcy Code, a debtor has the burden of establishing that: (1) it was unable to obtain unsecured credit; (2) the proposed credit transaction is necessary to preserve assets of the estate; and (3) the terms of the proposed credit agreement are fair, reasonable, and adequate in light of the circumstances of the debtor and the proposed lender. *See In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

95.     In this case, the New First Hope Loan is the only financing source available to the Debtor, at this time, which is necessary to preserve the most significant asset of the estate, the Property, and to fund the Debtor's day to day operations.  Moreover, the terms of the New First Hope Loan are fair, reasonable, and adequate in light of the current state of liquidity in the capital markets and the financial state of the Debtor.  Accordingly, to the extent the New First Hope Loan is considered in the context of section 364(c) of the Bankruptcy Code, the New First Hope Loan should be allowed pursuant to section 364(c) of the Bankruptcy Code.

96.     Moreover, the use of the Construction Loan and the New First Hope Loan are a reasonable exercise of the Debtor's business judgment and should be allowed pursuant to section 364(b) of the Bankruptcy Code.

97.     The Debtor has a valuable asset in the Beach Property, which was not generating revenue prior the Beach Agreement.  The Debtor therefore requires financing to ensure that it makes constructive use of the bankruptcy process, and can reorganize its business and affairs in way that benefits all parties-in-interest.    Such reorganization efforts include the successful development and sale of the subdivisions on the Property as exemplified in the Beach Agreement.  The use of the funds made available in the Construction Loan is critical to the successful completion of the Beach Agreement.

98.     Finally, the Debtor also seeks authority to convey the Security Lots to First Hope in accordance with the terms of the New First Hope Loan, pursuant to sections 105 and 363 of the Bankruptcy Code.

99.     The Debtor relies on the authorities already cited herein regarding a sale/conveyance of the estate's interest in property outside the ordinary course of business.  The Debtor does note, however, that (i) a sound business justification exists for the conveyance of the Security Lots.   First Hope requires the conveyance of the Security Lots as part of its agreement to allow the Debtor access to the Construction Loan and to provide new financing in the form of the New First Hope Loan; (ii) adequate and reasonable notice of this Motion was given to all interested parties; (iii) the conveyance will produce a fair and reasonable result that will increase the overall all value of the Property; and (iv) the Debtor and First Hope have acted in good faith and agreed upon the terms of the New First Hope Loan, including the conveyance of the Security Lots, after lengthy arms-length negotiation.

100.    Accordingly, the proposed financing, in the form of both the Construction Loan and the New First Hope Loan, is necessary and beneficial for the estate and its creditors, and the reasonable exercise of business judgment by the Debtor.  The conveyance of the Security Lots should also be authorized in accordance with the terms of the New First Hope Loan.

E.    **Authorizing the Payment of Retainer to Trenk DiPasquale**

101.    The Debtor also seeks the approval to pay Trenk DiPasquale the Postpetition Retainer out of funds from the New First Hope Loan.  As illustrated by Judge Winfield in *In re Truong*, 259 B.R. 264 (Bankr. D.N.J. 2001), courts within this District have often approved the payment of postpetition retainers to professionals.[6]  As noted by the *Truong* Court, courts consider the following when determining whether to allow the payment of a postpetition retainer to professionals:

> . . . . (1) the retainer's economic impact on the debtor's ongoing business operation; (2) the retainer's economic impact on the debtor's ability to reorganize; (3) the amount and reasonableness of the retainer; (4) the reputation of debtor's counsel; and (5) the ability of debtor's counsel to disgorge such payments at the conclusion of the case should the Court determine that the fees paid to counsel are not justified.  The Court also noted that although post-petition retainers and the ability to draw against such retainers are granted in large bankruptcy cases, usually to large law firms, smaller law firms should not be treated any differently.

*Truong*, 259 B.R. at 268 citing *In re Jefferson Bus. Ctr. Assocs.*, 135 B.R. 676, 680 (Bankr. D.Colo.1992).

102.    The Debtor respectfully submits that the facts of this case meet the criteria set forth in *Truong*.  First, the funds for the Postpetition Retainer were not taken out of the Debtor's

---

[6] In *Truong* the debtors' case was converted from one under chapter 13 to chapter 11 of the Bankruptcy Code and the debtors sought approval for the retention of counsel and payment of $15,000 on a postpetition retainer.  The United States Trustee filed a limited objection.  The court held, among other things, that the payment of a postpetition retainer was proper.

cash flow and do not affect the Debtor's ability to pay postpetition expenses.    Indeed, the

retainer is a line item specifically designated in the New First Hope Loan to assist in the effective

reorganization of the Debtor's estate.    Second, by retaining counsel, the Debtor will continue to

enjoy the benefit of counsel's advice and guidance, which will increase its prospect of

reorganization. Third, the specific amount of the retainer is not extraordinary when balanced

against the services which must be rendered, which include negotiating with various parties in

interest, the sale of estate assets, and the formation of a viable plan of reorganization.    Fourth, it

is clear from the examination of the record that this case involves a corporate Debtor with a

certain amount of complexity that demands experienced bankruptcy counsel.    Trenk DiPasquale

is an experienced law firm with a history of handling sophisticated bankruptcy matters.    Finally,

counsel is not requesting that it be permitted to draw against the retainer prior to further

allowance of compensation by this Court.

### TIMING AND NOTICES AS TO THE USE OF CASH COLLATERAL

103.    The Debtor respectfully seeks, as to the use of Cash Collateral, a two-part hearing

process. First, pursuant to Bankruptcy Rule 4001(b)(2), the Debtor seeks a preliminary hearing

on the use of Cash Collateral in accordance with the Budget on less than fifteen (15) days'

notice.    Second, the Debtor seeks a final hearing on at least fifteen (15) days' notice.    At a

minimum, the Debtor proposes to give notice pursuant to Bankruptcy Rule 4001(b)(1) and (3) to

the Office of the United States Trustee, all secured creditors, the twenty (20) largest unsecured

creditors, any other parties claiming an interest in the cash collateral, and any party who has

requested notice.

## NOTICE OF THE MOTION

104.    Notice of the Motion has been given to: (1) the United States Trustee for the

District of New Jersey; (2) First Hope; (3) Robert Giblin; (4) those parties requesting notice

pursuant to Bankruptcy Rule 2002; (5) the Buyers; and (6) the twenty (20) largest unsecured

creditors.  In light of the nature of the relief requested herein, the Debtor submits that no other or

further notice is required.

## NO PRIOR REQUEST

105.    No previous request for the relief sought herein has been made to this or to any

other Court.

## WAIVER OF BRIEF

106.    As no novel issue of law is raised and the relevant authorities relied upon by the

Debtor are set forth herein, the Debtor respectfully request that the requirement of D.N.J. LBR

9013-2 that briefs must be filed be waived.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that this Court grant the relief sought

herein, and grant such other and further relief as this Court deems just, proper, and equitable.

> **TRENK, DiPASQUALE, WEBSTER,**
> **DELLA FERA & SODONO, P.C.**
> *Proposed Attorneys for Debtor and*
> *Debtor-in-Possession*
>
> By:_____
> RICHARD D. TRENK

Dated: December 21, 2010

## VERIFICATION PURSUANT TO 28 U.S.C. § 1746

I, **Brian Delaney**, hereby verify that the foregoing statements are true and correct to the best of my knowledge and belief.

Dated:  December 21, 2010

BRIAN DELANEY